### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS MISEVICH, | ) | |
| | ) | No. 11 CV 2843 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | August 24, 2012 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Thomas Misevich applied for Social Security disability benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d), 1382(c), claiming that his degenerative disc disease, joint disease, and hypertension preclude him from working. An Administrative Law Judge ("ALJ") concluded that Misevich's impairments are severe but not disabling and denied Misevich's application for benefits. Misevich challenges this denial in a motion for summary judgment. For the following reasons, Misevich's motion is granted insofar as it requests a remand:

### Procedural History

Misevich applied for DIB and SSI in October 2007, alleging that he became disabled on September 1, 1999, due to degenerative disc disease and hypertension. (Administrative Record ("A.R.") 180-83, 184-86.) The Commissioner denied his applications in February 2008 (id. at 83-87, 88-92), and again on reconsideration in May 2008 (id. at 101-08).

Thereafter, Misevich requested and received a hearing before an ALJ. (Id. at 109-13.) On May 5, 2010, the ALJ issued a decision finding Misevich not disabled. (Id. at 12-22.) The Appeals Council denied Misevich's request for review on March 25, 2011 (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Pursuant to 42 U.S.C. § 405(g), Misevich initiated this civil action for judicial review of the Commissioner's final decision. The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c).

## Background

### A.    Summary of Medical Evidence

Misevich, who is 46 years old, suffers from degenerative disc disease. He also has a history of controlled hypertension. Beginning in 2001, Misevich began reporting back pain to his medical providers. (A.R. 458.) Radars taken of his chest and spine in 2002 revealed degenerative changes in Misevich's lower thoracic spine. (Id. at 485, 559, 587.) A CT scan of Misevich's thoracic spine demonstrated degenerative joint changes of the facet joints and prominent osteophytes[1] projecting from his T8 through T10 levels of his thoracic spine,[2]

_____

[1] Osteophytes, also known as bone spurs, are bony projections that often form when bones meet each other. *See* Dorland's Illustrated Medical Dictionary, at 1348 (32nd ed.); *see also* http://www.mayoclinic.com/health/bone-spurs/DS00627 (last visited on Aug. 23, 2012). Osteophytes are associated with osteoarthritis or degenerative joint disease, a progressive disorder of the joints caused by the gradual loss of the protective cartilage on the ends of bones. *See* http://www.mayoclinic.com/health/osteoarthritis/DS00019/ (last visited on Aug. 23, 2012).

[2] The thoracic spine refers to the part of the spine that is comprised of twelve thoracic vertebrae, labeled T1-T12; it joins the cervical spine (comprised of seven vertebrae, labeled

indicating degenerative disc change; the CT revealed no fractures, disc narrowing, malignment, or herniated disc throughout the lower thoracic spine. (Id. at 601.) A bone density scan performed around the same time showed that Misevich also suffered from osteopenia.[3] (Id. at 589-91.)

In early 2003, Misevich complained to Dr. William Mikaitis that he was experiencing back pain that was not improving. (Id. at 371-72.) In March 2003, a magnetic resonance imaging (MRI) test and radiology report disclosed a left-sided L5-S1 herniated disc. (Id. at 435-37.) Progress notes evaluating the MRI results noted that since November 2002, Misevich had experienced persistent radicular lower back pain that had increased in recent weeks and that he had a history of diffuse spine problems—cervical and thoracic—which had not yet required surgery, but had caused diffuse aching. (Id. at 530-31.) In May 2003, Misevich underwent a left L5-S1 microdiscetomy. (Id. at 331-33.) Dr. Steven Mather, who performed the procedure, noted that Misevich had experienced severe left leg and back pain for the last several weeks that had not improved with "conservative management." (Id. at 331.) In December 2003, Misevich continued to report back pain to Dr. Mikaitis (id. at 362),

---

C1-C7), at the bottom of the back of the neck and extends five inches past the bottom of the shoulder blades, where it connects with the lumbar spine (comprised of five vertebrae, labeled L1-L5). *See* Dorland's Illustrated Medical Dictionary, at 205, 1705 (32nd ed.); Stedman's Medical Dictionary, at 2118-19 (28th ed.).

[3] Osteopenia is a bone condition characterized by a decreased density of bone, which leads to bone weakening and an increased risk of bone fracture. *See* Dorland's Illustrated Medical Dictionary, at 1347, 1348 (32nd ed.); http://www.medicinenet.com/osteopenia/article.htm (last visited on Aug. 23, 2012). While osteopenia and osteoporosis are related conditions, in osteopenia, the bone loss is not as severe as in osteoporosis. *Id.*

and later that month, he sought emergency medical treatment, complaining of lower back pain lasting about one month; an examination of his lumbar spine revealed no tenderness or spasm, intact sensory and motor functions, and normal gait and reflexes. (Id. at 692-94.) A radiology report from that visit noted that views of the thoracic spine showed satisfactory vertebral alignment and no evidence of acute injury, though spondylosis changes were evident.[4] (Id. at 423.)

Misevich underwent several tests in 2004 to assess his back pain. The first— an MRI, which occurred in January—suggested a benign hemangioma[5] on the right aspect of the T8 vertebral body, with an otherwise unremarkable thoracic spine exam. (Id. at 421-22.) A bone scan confirmed the existence of a benign hemangioma on the thoracic spine. (Id. at 413.) A June MRI spinal survey suggested mild canal stenosis[6] at the C3-C4 and C4-C5 levels based on the presence of prominent posterior marginal osteophytes, and at the C5-C6 and C6-C7 levels on the basis of focal central disc bulges; mild degenerative disc changes

---

[4] Spondylosis is the wearing down or degeneration of the spine caused by wear and tear on the joints; it is the result of osteoarthritis. *See* Dorland's Illustrated Medical Dictionary, at 1754 (32nd ed.); *see also* http://www.localhealth.com/article/spondylosis (last visited on Aug. 23, 2012).

[5] A spinal hemangioma is a tumor, usually benign, found in the thoracic or lumbar spine. *See* http://www.mayoclinic.com/health/spinal-tumor/ds00594/dsection=causes (last visited on Aug. 23, 2012).

[6] Spinal stenosis is the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone on the space; symptoms may include pain, numbness, or muscle weakness. *See* Dorland's Illustrated Medical Dictionary, at 1770 (32nd ed.); *see also* http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited on Aug. 23, 2012).

in the mid to lower thoracic spine without definite sign of canal stenosis; recurrent disc protrusion at L5-S1 on the left; and mild to moderate degenerative disc changes at L5-S1 and L4-5. (Id. at 401-04.)

The next year, in December 2005, Misevich sought emergency care for pain and swelling in his left knee, a condition that had persisted for a month and worsened with increased activity. (Id. at 716-19.) An examination revealed normal motor and sensory functions, but Misevich displayed an antalgic gait.[7] (Id. at 717.) An MRI of Misevich's lumbar spine later that month indicated a significant left posterolateral disc herniation at the L5-S1 level, with the existing nerve root compressed by the herniation; a diffusely bulging and partially degenerated disk at the L4-L5 level with minimal posterolateral disk protrusion; and a mild diffusely bulging disk at the L3-L4 level. (Id. at 743.) About six months later, in May 2006, a lumbar discogram and CT of the lumbar spine was performed, which indicated a radial tear on the left at the L4-L5 level and L5-S1 level. (Id. at 770-71, 806-08.) An MRI of the cervical spine done around the same time demonstrated degenerative changes throughout, and moderate central spinal stenosis at the C3-C4, C4-C5, and C6-C7 levels with mild to moderate central spinal stenosis at the C5-C6 levels. (Id. at 809-10.) An MRI of Misevich's thoracic spine done two months later showed the previously-discovered hemangioma and no evidence of significant spinal stenosis in the thoracic spine, but it noted anterior osteophytes at the T8-T9 and T9-T10 levels. (Id. at 811-12.)

_____

[7] An antalgic gait is an abnormal gait that an individual assumes to counteract or lessen pain. *See* Dorland's Illustrated Medical Dictionary, at 97 (32nd ed.).

5

Next, in February 2007, Misevich sought emergency medical treatment after falling and hitting his head. (Id. at 725-30.) He complained of headaches and dizziness; an inspection of his back revealed no tenderness, and normal upper and lower extremities. (Id. at 726.) A CT of Misevich's cervical spine revealed spondylotic changes of the spine with at least a moderate degree of central canal stenosis, most notable at the C3-C4 level. (Id. at 731, 753-54.) A CT of Misevich's thoracic and lumbar spine performed around the same time showed degenerative anterior osteophytes involving thoracic vertebral bodies and degenerative changes of the lumbar spine, predominantly at the L5-S1 level. (Id. at 733-34, 756.) A few months later, Misevich saw Dr. Ben Roitberg for spinal pain, describing it as "severe or horrible," but not using a specific term of describing a particular character for the pain. (Id. at 759.) The notes from the visit indicate that Misevich was taking Vicodin, Oxycodone, and eventually Demerol for pain control. (Id.) A total body bone scan done in July 2007 at Rush University revealed slightly increased activity in the lumbar spine on about L4 on the right side, which was consistent with degenerative joint disease. (Id. at 750-51.)

In January 2008, Dr. Richard Bilinsky, a state agency physician, reviewed Misevich's medical file and completed a Physical Residual Functional Capacity Assessment form. (Id. at 782-89.) Dr. Bilinksy opined that Misevich can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally climb ladders, ropes, and scaffolds, and occasionally stoop, kneel, crouch or crawl. (Id. at 784.)

Later that month, Dr. Dinesh Jain wrote a letter to the Illinois Department of Human

6

Services' Bureau of Disability Determination Services, evaluating Misevich's history and present symptoms. (Id. at 779-81.) Dr. Jain noted that Misevich had experienced low back pain since 2001, quantifying the intensity of the pain as an eight on a scale of 10, with 10 being the worst pain. (Id. at 779.) Misevich reported to Dr. Jain that despite his 2003 surgery, he continued to have radiating pain. (Id.) Misevich also reported pain in his mid-thoracic spine region, which he quantified as a seven out of 10. (Id.) An examination revealed no redness or swelling in his joints, normal range of motion along the joints of his upper and lower extremities, normal range of motion along his cervical spine, decreased range of motion of the lumbar spine due to the pain, and positive straight leg raising signs[8] with pain in his hip and left thigh. (Id. at 780-81.) Dr. Jain observed that Misevich used a cane to ambulate due to his back pain, but also noted that his gait was normal and that he displayed no difficulty with tandem walking. (Id. at 781.)

Four months later, on May 5, 2008, Dr. Mark Reiter, Misevich's treating physician since 2006, wrote a letter to the Social Security Administration ("SSA") describing Misevich's condition.[9] (Id. at 796.) Dr. Reiter stated that Misevich's severe disc disease of

---

[8] The straight leg raise is a test performed to diagnose disc disease or sciatica—pain along the sciatic nerve that usually results from compression of nerve roots in the lower back and is commonly caused by disc disease, osteophytes, and spinal stenosis. *See* The Merck Manual at 325, 327 (18th ed.). With the patient lying on his back, the leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy. *See* Dorland's Illustrated Medical Dictionary, at 1713, 1900 (32nd ed.).

[9] Although the record does not reflect the position of the letter's recipient, Misevich suggests, and the Commissioner does not dispute, that Scott Hooge—to whom the letter was

the lumbar and cervical spines markedly limit his ability to walk, climb, carry, lift, and stand. (Id.) He noted that Misevich could sit for "average periods" as long as he can change positions. (Id.) The doctor added that although Misevich had no mental defects, the pain medications he took to function made him "somewhat drowsy." (Id.) In August, Misevich underwent a second surgery, an L5-S1 laminectomy, for a lumbar fusion. (Id. at 899-901.)

Misevich continued to report back pain. An October 2009 x-ray of Misevich's lumbar spine showed shallow scoliosis of the thoracolumbar spine but no evidence of compression fracture. (Id. at 800.) In November 2009, Dr. Reiter completed a "Lumbar Spine Residual Functional Capacity Questionnaire." (Id. at 801.) Dr. Reiter diagnosed Misevich with accelerated osteoarthritis of the spine and knee; noted that Misevich had symptoms which included pain and back spasms and that x-rays and MRI's of his spine demonstrated his osteoarthritis, and gave a "guarded" prognosis, stating that further surgery may be required. (Id. at 802.) Dr. Reiter opined that Misevich can walk less than half a block without rest or severe pain, can continuously sit for 10 minutes and stand for five minutes at a time, can sit and stand less than two hours in an eight-hour workday, and can never lift or carry much, even if the weight is less than 10 pounds. (Id. at 803-04.) Dr. Reiter further opined that Misevich must walk every 10 minutes for five minutes at a time, must have a job that permits shifting positions at will, and must take three to four unscheduled breaks for five to 10 minutes during an eight-hour workday. (Id. at 803.) Dr. Reiter added that Misevich will

addressed—was an SSA employee who asked Dr. Reiter to render an opinion regarding Misevich's residual functional capacity. (R. 25, Pl.'s Mem. at 9 n.2.)

likely be absent from work more than four times a month.  (Id. at 805.)  Further progress

notes from Dr. Reiter noted that during a lumbar exam, Misevich demonstrated paralumbar

spasm, positive straight leg raising at 30 degrees, and decreased reflexes at the ankles.  (Id.

at 819.)  Later that month, Misevich underwent a CT of his cervical spine, which showed a

mild compressive deformity of the C4 and C5 vertebral body, a fracture of spinous process

of the T1 vertebral body, moderate central spinal stenosis at the C3-C4 and C4-C5 levels,

moderate to severe spinal stenosis at the C5-C6 level, mild scoliosis of the thoracic spine to

the right, and stable degenerative changes in the thoracic spine without significant central

canal or foraminal stenosis.  (Id. at 813-14.)

In February 2010, Dr. Reiter completed an "Arthritis/Pain Residual Functional

Capacity Questionnaire."  (Id. at 894-98.)  Dr. Reiter noted that Misevich suffers from the

early onset of severe degenerative disc disease and that his prognosis was "poor."  (Id. at

894.)  Dr. Reiter stated that Misevich suffered from severe chronic back and neck pain and

that positive objective signs of his ailments included reduced range of motion in his back and

neck, reduced grip strength, sensory and reflex changes, impaired sleep, abnormal posture,

tenderness, muscle weakness and atrophy, an abnormal gait, and a positive straight leg

raising test.  (Id. at 894.)  Dr. Reiter opined that Misevich could walk less than half a block

without rest or severe pain, can sit for 15 minutes and stand for 20 minutes at a time, can sit

and stand for less than two hours in an eight-hour workday, and can never lift or carry, even

if the weight is less than ten pounds.[10]  (Id. at 895.)  Dr. Reiter noted that Misevich required

a job that permitted shifting positions at will and was only comfortable when lying flat.  (Id.)

## B.    Misevich's Testimony

At the hearing before the ALJ, Misevich testified that in 1999, he began experiencing

severe, throbbing back pain.  (A.R. 38.)  The pain he experienced radiated from his back to

his left leg.  (Id. at 49.)  Misevich testified that he had undergone three back injections to

decrease the pain, but they did not help.  (Id.)  In 2003, he underwent surgery on his lumbar

spine, which provided relief of the pain for about six months, before returning.  (Id.)

To alleviate the continuous back pain and pain in his cervical spine, Misevich testified

that he takes Demerol, which leaves him "very fatigued," "very drowsy," and "worn out."

(Id. at 40-41, 57.)   Misevich stated that the Demerol provides relief for about four

hours—alleviating the pain about 70 percent—before it wears off and he has to take more.

(Id. at 42, 57.)  Prior to the Demerol, Misevich took a variety of pain medications—Vicodin,

Norco, Oxycodone, and morphine sulfate, extended release—with varying degrees of

success.  (Id. at 40.)  These medications, according to Misevich, left him unable to function

and made him feel "like a zombie."  (Id.)  Misevich sees Dr. Reiter every three to four

months to monitor his use of pain medication.  (Id. at 41.)

---

[10]  There appears to be an inconsistency in this questionnaire.  Dr. Reiter indicated that
Misevich can "[n]ever" lift and carry an item, even if it is "[l]ess than 10 lbs.," but indicated
just below that Misevich can "[r]arely" lift and carry as much as "50 lbs."  (A.R. 896.)

Despite the pain medication—which Misevich qualified as somewhat alleviating the pain—he testified that he suffers from "horrible, chronic pain every day." (Id. at 40.) Misevich then described the limitations on his daily living as a result of the pain. He stated that he can only sit for seven to 11 minutes before the pain requires him to stand, and then stand for seven to 11 minutes before experiencing more pain; he can walk about half a block; and he can only lift about a maximum of five pounds. (Id. at 41-42, 46.) Misevich described lying flat as the only position that provides him relief from the pain. (Id. at 42.) He also testified that as a result of the pain, he must take a sleeping pill to fall asleep. (Id. at 46.) Misevich then described his current living situation and his daily activities: he lives in the basement of his parents' home; he does not assist his parents with shopping or chores because he cannot carry bags; he cannot sit in a car for more than 20 minutes unless he is lying flat, and if so, only for an hour; and he only socializes with his friends over the phone because he cannot leave the house due to the continuous pain he experiences. (Id. at 47, 56.)

## C.    Vocational Expert's Testimony

Vocational expert ("VE") Thomas Gusloff testified that Misevich's past relevant work as a shipping/receiving clerk constitutes medium-level and skilled work. (A.R. 62.) He described Misevich's past work as a material handler as constituting semi-skilled and heavy-level work, though he performed it at the medium level. (Id. at 63.) The ALJ asked Gusloff to consider a hypothetical individual with Misevich's age, education, and work experience who is capable of performing light work, occasionally climbing ramps, stairs, ladders, ropes, or scaffolds, and occasionally stooping, kneeling, crouching, and crawling. (Id.) Gusloff

11

testified that this hypothetical individual would not be capable of performing Misevich's past work because those occupations were beyond light-level work. (Id.)

The ALJ next asked whether any unskilled positions existed for the hypothetical individual who had the same postural limitations but was limited to sedentary work and, who also after sitting for one hour, needed to stand in place for five to 10 minutes. (Id. at 64.) Gusloff responded that the following sedentary, unskilled positions would be available: order clerk for food and beverage, preparer for plated ware, and a stuffer of toys. (Id. at 65.) The ALJ then modified the hypothetical again, asking the VE to consider whether any unskilled occupations existed for an individual who is limited to sitting, standing, and walking less than two hours with the need to shift at will, who cannot perform any lifting and has only 20 percent use of his arms for reaching, who must walk after 10 minutes and walk each time for five minutes, who must take three to four unscheduled breaks per hour, and who would miss more than four days a month. (Id.) The VE responded that no jobs would be available because the number of breaks would take him away from work for too long, and the limitations in the use of his upper extremities and the number of missed days per month would limit the jobs available to him. (Id.) The ALJ modified the hypothetical one last time, asking the VE to consider whether there were any unskilled occupations for an individual who was limited to sitting, standing, and walking less than two hours, who needed to shift positions at will, and who "should never lift less than 10 pounds, but rarely lift 10 pounds,

20 pounds, and 50 pounds."[11] (Id. at 66.) Again, the VE testified that the postural limitations of this individual would be below a competitive, eight-hour day position. (Id.)

**D.      The ALJ's Decision**

On May 5, 2010, the ALJ issued a decision finding that Misevich is not disabled within the meaning of the Act. (A.R. 12-22.) The ALJ initially determined that Misevich met the Act's insured status requirements through December 31, 2004. (Id. at 14.) Then, in applying the standard five-step sequential analysis for determining disability, the ALJ evaluated Misevich's claim and concluded that: (1) Misevich had not engaged in substantial gainful activity since September 1, 1999, the alleged onset date of his disability; (2) his degenerative disc disease, joint disease, and hypertension constitute severe impairments; (3) these impairments do not individually or collectively meet or medically equal in severity a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) Misevich has the residual functional capacity ("RFC") to perform less than the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a); and (5) based on this RFC, he cannot perform any past relevant work, but there are jobs that exist in significant numbers in the national economy that he can perform. (A.R. 14-22.) Based on the VE's testimony, the ALJ concluded that Misevich was not disabled because he could perform the occupations of food

---

[11] This court is of the opinion that the limitation, "never lift less than 10 pounds, but rarely lift 10 pounds, 20 pounds, and 50 pounds" does not make sense. If an individual can never lift an item even if it is less than 10 pounds, he should not be ever be able to lift more than 10 pounds.

and beverage preparer, bench production, and a stuffer of toys or filling machine operator. (Id. at 21.)

## Analysis

In his motion for summary judgment, Misevich challenges the ALJ's decision in three respects. He first contends that the ALJ erroneously assessed the medical opinions of his treating physician, Dr. Reiter, by giving controlling weight to his 2008 opinion but failing to properly account for his 2009 and 2010 opinions. This mistake led the ALJ, Misevich argues, to erroneously assess his RFC. According to Misevich, the RFC assessment was incorrect because: (1) Dr. Reiter's 2008 opinion does not provide substantial evidence for the ALJ's conclusion that Misevich could sit continuously for one hour, and then stand for five to 10 minutes; and (2) the ALJ failed to explain how Misevich's daily living activities demonstrated an ability to perform even sedentary work. Finally, Misevich challenges the ALJ's credibility determination, questioning whether the ALJ drew improper conclusions from the objective medical evidence and improperly discounted his allegations of pain.

This court must confine its review of the Commissioner's decision to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and determine whether the ALJ's decision is supported by substantial evidence, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not "reweigh the

14

evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). But this court must remand the case if the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele*, 290 F.3d at 940, or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation marks omitted).

## A.     Governing Standards

To qualify for DIB and SSI under Titles II and XVI, a claimant must establish that he has a disability within the meaning of the Act.[12] 42 U.S.C. §§ 423(a)(1)(D), 1382(a). An individual is "disabled" if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Social Security regulations set forth a five-step sequential inquiry, which asks whether: (1) the claimant has engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's severe impairment meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) the claimant can perform his

---

[12] The regulations governing the determination of disability for DIB are set forth in 20 C.F.R. § 404.1501, *et seq.* The SSI regulations, which are nearly identical to the DIB regulations, are found at 20 C.F.R. § 416.901, *et seq.*

past work; and (5) the claimant is capable of performing work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; *see also Clifford*, 227 F.3d at 868.

If at step three, the ALJ finds that the claimant has a severe impairment that does not equal one of the listed impairments, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence" before moving on to step four. 20 C.F.R. § 404.1520(e). "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ uses the RFC to determine at steps four and five whether the claimant can return to his past work or different available work in the national economy. 20 C.F.R. § 404.1520(e)-(g).

"An affirmative answer [at each step] leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (internal quotation marks omitted). The claimant bears the burden of proof at steps one through four. *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). And if the claimant meets his burden through the first four steps, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then demonstrate that the claimant—in light of his age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(g).

## B.     Evaluation of Treating Physician's Opinions

16

Misevich contends that the ALJ erroneously gave controlling weight to Dr. Reiter's 2008 letter, improperly discounting the doctor's more recent 2009 and 2010 RFC opinions. (R. 25, Pl.'s Mem. at 8-12.)  The Commissioner counters that the ALJ reasonably rejected Dr. Reiter's later opinions because those RFC findings failed to provide any explanation of deterioration in Misevich's condition that would account for a change from his earlier opinion and because there was insufficient objective medical evidence demonstrating a worsening of Misevich's condition justifying that change.  (R.  27, Def.'s Mem. at 5-9.)

Dr. Reiter's May 5, 2008 letter provides that:

> In regards to Thomas Misevich, Mr. Misevich is a 41 year old white male with early onset rather advanced degenerative osteoarthritis of the spine and knees. His severe disc disease of the lumbar and cervical spines markedly limits his ability to walk, climb, carry, lift, and stand.  He can sit for average periods as long as he can change positions.  He has no mental defects, although the pain medications he requires to function make him somewhat drowsy.  He is also followed [by] Rush Medical Center for this problem.

(A.R. 796.)

In the November 2009 RFC form, Dr. Reiter opined that Misevich can walk less than half a block without rest or severe pain, can continuously sit for 10 minutes and stand for five minutes at a time, can sit and stand less than two hours in an eight-hour workday, and cannot ever lift much, even if the weight is less than 10 pounds.  (Id. at 803-04.)  Dr. Reiter further opined that Misevich must walk every 10 minutes for five minutes at a time, must have a job that permits shifting positions at will, and must take three to four unscheduled breaks for five to 10 minutes during an eight-hour workday.  (Id. at 803.)

17

Dr. Reiter then noted in the February 2010 RFC questionnaire that Misevich could walk less than half a block without rest or severe pain, can sit for 15 minutes and stand for 20 minutes at a time, can sit and stand for less than two hours in an eight-hour workday, and cannot ever lift much, even if the weight is less than 10 pounds. (Id. at 895.) Dr. Reiter opined that Misevich required a job that permitted shifting positions at will and stated that Misevich was only comfortable when lying flat. (Id.)

The ALJ gave controlling weight to Dr. Reiter's 2008 letter, finding that his 2009 and 2010 RFC opinions were "totally different" "without any explanation of significant deterioration of [Misevich's] condition" and that the limitations in his 2008 letter are the "most accurate representation of [Misevich's] overall functioning." (Id. at 19.) The ALJ began with Dr. Reiter's 2009 RFC, noting that although Misevich had undergone a second surgery after Dr. Reiter sent his 2008 letter, the medical evidence after that surgery did not demonstrate debilitating symptoms. (Id.) To support this conclusion, the ALJ cited the lack of corresponding office notes to Dr. Reiter's February 2010 check-off form, which had noted various neurological abnormalities, Dr. Reiter's November 2009 treatment notes that stated "only that the claimant had paralumbar spasm, positive straight leg raising at 30 degrees, and decreased reflexes at the ankles"; Dr. Reiter's failure to note any lack of motor or sensory deficits at that time; Misevich's October 2009 lumbrosacral CT, which showed no evidence of compression fracture or subluxation; and the November 2009 cervical and thoracic CT scans, neither of which accounted for debilitating symptomatology. (Id.) In rejecting the 2010 RFC opinion, the ALJ surmised that Dr. Reiter merely relied on Misevich's subjective

complaints in completing it, citing his statement that Misevich was only comfortable when lying flat, a fact that Misevich expressed at the hearing. (Id.) These "inconsistencies" led the ALJ to reject Dr. Reiter's later RFC opinions. (Id.)

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870. An ALJ may discount a treating physician's medical opinion if it "'is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'" *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)); *see also Clifford*, 227 F.3d at 871 (stating that "internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion"); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

There are several flaws in the ALJ's analysis of Dr. Reiter's 2008 opinion. First, the ALJ found Dr. Reiter's 2008 opinion to be inconsistent with, and "totally different" from, his 2009 and 2010 RFC assessments. (A.R. 19.) But the court is not so sure that such an inconsistency is present. In his May 2008 letter, Dr. Reiter opined that Misevich could sit for "average periods as long as he can change positions." (Id. at 796.) Nowhere in his letter did he quantify what he meant by "average." (Id.) On the other hand, the 2009 and 2010 RFC questionnaires are more specific and are fairly consistent with each other with Dr. Reiter essentially opining that Misevich could walk less than one half block without rest

19

or severe pain, sit continuously for 10 or 15 minutes and then stand for five or 20 minutes, and stand and walk for less than two hours in an eight-hour workday. (Id. at 802-04, 895.) Contrary to the ALJ's conclusion, Dr. Reiter's 2008 opinion that Misevich could sit for "average periods" is not necessarily contradictory to his later, more specific and restrictive opinions. And to the extent these opinions are not precisely consistent, the different formats of the opinions could account for the alleged inconsistencies. *See Scivally v. Sullivan*, 966 F.2d 1070, 1076-77 (7th Cir. 1992) (noting that general answer does not necessarily negate fact-specific answers); *see also Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010).

Moreover, as Misevich reasonably argues (R. 25, Pl.'s Mem. at 11), the generalities of Dr. Reiter's opinion is reasonably explained for at the time he wrote the 2008 letter, there was no reason for him to describe all of Misevich's functional limitations. By contrast, the 2009 and 2010 RFC assessment's were written questionnaires asking Dr. Reiter to evaluate specific criteria. The different format of the opinions also reasonably explains Dr. Reiter's failure to provide in his 2009 and 2010 RFC opinions "any explanation of significant deterioration of [Misevich's] condition" (A.R. 19), an omission the ALJ found significant in discrediting Dr. Reiter's later opinions. *See Larson*, 615 F.3d at 750 (noting that physician's failure to explain answers on questionnaire was not significant where "in every section on the questionnaire that allowed for comments, Dr. Rhoades made them; the question dealing with Larson's functional limitations . . . did not invite further explanation or include space for comments"); *Scivally*, 966 F.2d at 1076-77. Accordingly, because several of the reasons that the ALJ gave in affording controlling weight to Dr. Reiter's 2008

20

opinion are faulty, there is not a substantial basis for the ALJ's conclusion that the 2009 and 2010 questionnaires should be rejected as "totally different" from the 2008 opinion and disregarded as accurate descriptions of Misevich's functional limitations. *See Scivally*, 966 F.2d at 1076-77.

The Commissioner contends that the ALJ's rejection of Dr. Reiter's 2009 and 2010 RFC opinions was supported by substantial evidence because those opinions were inconsistent with the objective medical evidence that the ALJ cited as evidence demonstrating that Misevich's condition had not worsened. (R. 27, Def.'s Mem. at 6.) But as Misevich points out, the cited evidence does not necessarily suggest his condition had not deteriorated. (R. 25, Pl.'s Mem. at 12.) The ALJ pointed to office records demonstrating few neurological deficits and Dr. Reiter's November 2009 treatment notes which failed to describe any motor or sensory deficits (A.R. 18-19), noting that the notes "only" described paralumbar spasm, positive straight leg raising, and decreased reflexes at the ankles (id. at 19). These indications, however, also tend to support Misevich's allegations of a worsening condition and pain, *see supra* at n.8, but the ALJ failed to discuss the implications of these symptoms and their effect on her determination. In this respect, the ALJ failed to provide a logical bridge from the medical evidence to her conclusion. *See Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001) (finding that ALJ's decision failed to permit an "informed review" where ALJ discussed medical evidence favoring denial of benefits but "made no attempt to explain why the other evidence in the record, which appear[ed] to favor Zurawski . . . was overcome by the evidence on which she relied").

21

The ALJ also discredited Dr. Reiter's most recent opinion because in it, he noted that Misevich was only comfortable while lying flat, a statement that Misevich echoed at the hearing. (A.R. 19.) The Commissioner contends this was an appropriate reason to give that opinion diminished weight because medical opinions should be based on objective considerations, and not amount to a recitation of a claimant's subjective complaints. (R. 27, Def.'s Mem. at 7.) While true, *see Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004), the ALJ provided no evidence to support her assumption that Dr. Reiter was merely parroting Misevich's complaints to him. It is possible that Dr. Reiter reached this conclusion independently during a physical examination. Because Dr. Reiter did not say he was relying on Misevich's description of his comfort level in making the notation regarding his need to lie flat, the ALJ's conclusion that Misevich's subjective description is the basis of that medical evidence rests on nothing but speculation. That is not a permissible basis for the ALJ's analysis. *See White v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999).

Misevich briefly challenges the ALJ's decision to give controlling weight to Dr. Reiter's 2008 letter by arguing that the ALJ failed to consider his 2008 surgery. (R. 25, Pl.'s Mem. at 12.) But a reading of the ALJ's opinion belies this claim. The ALJ referenced Misevich's 2008 surgery twice in her analysis of Dr. Reiter's and Dr. Bilinsky's opinions.[13] (A.R. 19) (stating "[w]hile the claimant had surgery in November 2008"); (id. at 20) (stating "[t]he medical evidence subsequent to the claimant's most recent back surgery"). It therefore

---

[13] The court notes, however, that the ALJ incorrectly noted that Misevich's 2008 surgery occurred in November 2008. (A.R. 19.) The record demonstrates that the surgery occurred in August 2008. (Id. at 899-901.)

appears that the ALJ was fully aware of Misevich's 2008 surgery when assessing Dr. Reiter's 2008 opinion but found that this and the other cited medical evidence did not demonstrate a worsening of Misevich's condition. The ALJ's rejection of Dr. Reiter's more recent RFC opinions is nevertheless marked by assumptions and conclusions that are not supported by substantial evidence in the record. Accordingly, a remand on this issue is warranted for the ALJ to reconsider Dr. Reiter's opinions and to develop the record more fully.

**C.     RFC Assessment**

The ALJ concluded that Misevich has the RFC to perform less than the full range of sedentary work, including the ability to lift and carry 10 pounds, occasionally climb, stoop, kneel, crouch, and crawl, and work where he can shift positions where after sitting continuously for one hour, he can stand for five to 10 minutes and then sit. (A.R. 17.) Misevich challenges this RFC assessment on two grounds. First, Misevich contends that Dr. Reiter's May 2008 opinion, on which the ALJ relied to arrive at this RFC assessment, did not provide substantial evidence for her conclusion regarding Misevich's ability to continuously sit and then stand. (R. 25, Pl.'s Mem. at 13-14.) Second, Misevich argues that the ALJ failed to explain how his daily activities demonstrated an ability to perform sedentary work. (Id. at 14-15.) In response, the Commissioner asserts that the ALJ's interpretation of Dr. Reiter's opinion was reasonable in light of the longitudinal medical evidence which showed generally unremarkable findings. (R. 27, Def.'s Mem. at 8.) The court finds that the ALJ erred in assessing Misevich's RFC because the determination that he could sit continuously for one hour was not supported by any evidence. Nor did the ALJ

23

provide adequate explanation for her decision that Misevich's daily activities demonstrated that he could meet the requirements of even the limited sedentary work the ALJ outlined.

In evaluating a claimant's RFC, an ALJ must consider all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). According to SSA regulations, the ALJ must do more than simply list or acknowledge the relevant evidence. Rather:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7.

In this case, the ALJ rejected Dr. Reiter's 2009 and 2010 RFC assessments, concluding that they were not the most accurate representation of Misevich's overall functioning. (A.R. 19.) The ALJ also rejected Misevich's testimony that he could only sit for seven to 11 minutes before needing to stand. (Id.) The ALJ further rejected the opinion of Dr. Bilinksy, the non-examining State agency physician, who concluded that Misevich could perform light work (id. at 782-92), determining that the medical evidence adduced after Misevich's 2008 surgery, his medication usage, his treatment history and daily activities establish that he could not execute the lifting, standing, and walking required of light work

24

(id. at 19). Instead, relying on Dr. Reiter's 2008 opinion, the ALJ determined that Misevich has the RFC to perform less than the full range of sedentary work. (Id. at 20).

But Dr. Reiter's 2008 opinion standing alone is not substantial evidence supporting the ALJ's finding about Misevich's ability to continuously sit for an hour. In his letter, Dr. Reiter opined that Misevich could sit for "average periods as long as he can change positions." (Id. at 796.) Unlike his 2009 and 2010 RFC assessments which specifically delineate the periods of time that Misevich could continuously sit and stand, Dr. Reiter's 2008 opinion did not specify what constitutes an "average period" of time. The Commissioner attempts to fill the "evidentiary gap," *see Chase v. Astrue*, 458 Fed. Appx. 553, 557 (7th Cir. 2012), left by Dr. Reiter's 2008 opinion by broadly citing the objective medical evidence, which, the Commissioner suggests, supports the ALJ's finding. (R. 27, Def.'s Mem. at 4, 8) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)). Misevich responds that because the only evidence the ALJ relied on in determining his RFC was Dr. Reiter's 2008 opinion, the ALJ's RFC finding must mirror that evidence. (R. 31, Pl.'s Reply at 1.)

The court need not answer that particular question because the court finds, in any event, that the ALJ failed to adequately explain how she reached her conclusion about Misevich's RFC as required by SSR 96-8p. The ALJ concluded that Misevich could sit continuously for one hour and said that her conclusion was based on Dr. Reiter's 2008 opinion. But that opinion does not provide sufficiently specific information for the ALJ to reach that conclusion. Nor did the ALJ identify any other medical evidence to substantiate her belief regarding Misevich's sitting capabilities, and the Commissioner—bound by the

reasons in the ALJ's written decision, *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)—does not point to any specific evidence that would support such a conclusion either. (R. 27, Def.'s Mem. at 8.)  In determining that she would afford controlling weight to Dr. Reiter's 2008 opinion over that of his 2009 and 2010 opinions, the ALJ recounted the medical evidence since Misevich's 2008 back surgery that she believed demonstrated a lack of significant deterioration in his condition. (A.R. 19.) But none of this evidence demonstrates an ability to sit continuously for one hour.  Nor does the medical evidence adduced after Misevich's 2008 back surgery, his medication usage, his treatment history, and daily activities—to which the ALJ cited and on which she relied in concluding that Misevich could not perform the lifting, standing, and walking required of light work—support the ALJ's conclusion regarding Misevich's capacity to continuously sit for an hour.

Ultimately, while the ALJ's opinion cited certain specific medical facts (Misevich's CT scans) and non-medical evidence (daily activities), absent from that opinion is a "narrative discussion describing how the evidence supports" the RFC finding. SSR 96-8p, 1996 WL 374184, at *7; *see Scott*, 647 F.3d at 740 ("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities."); *Briscoe* , 425 F.3d at 352-53. The ALJ's omission is especially problematic where "the primary piece of evidence that she relied on does not support the propositions for which it is cited." *Scott*, 647 F.3d at 740.

This brings the court to Misevich's second attack on the ALJ's RFC finding, this one focused on his daily activities.  The court finds this aspect of the ALJ's decision deficient for the same reason.  The ALJ determined that Misevich's daily activities reflect an ability to do

at least a reduced range of sedentary work. (A.R. 19.) The ALJ recited Misevich's hearing testimony about how his daily activities are limited by pain: he rarely drives and was dropped off at the hearing; on a typical day, he will eat breakfast, take his pain medications, talk on the telephone, and read for leisure; and he lives in his parents' basement and does not help with the chores or shopping. (Id.) But the ALJ's analysis does not, contrary to SSR 96-8p's mandate, provide a narrative discussion describing how this evidence demonstrates Misevich's ability to perform even a reduced range of sedentary work.

An RFC is "an assessment of an individual's ability to sustain work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1. "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a). The regulations further provide that "[s]ince being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5. The ALJ failed to sufficiently explain her equating of Misevich's daily activities like eating, taking medication, reading, and talking on the phone to engaging in the rigors of full-time employment. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (noting certain daily activities, while demanding, have a

"degree of flexibility that work in the workplace do[ ] not"); *see also Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (stating "[claimant's] ability to struggle through the activities of daily living does not mean that [he] can manage the requirements of a modern workplace"). While the Commissioner correctly notes that the ALJ was not required to show that Misevich's daily activities alone established that he was capable of performing eight hours of a reduced range of sedentary work (R. 27, Def.'s Mem. at 13), the ALJ was required to provide a narrative discussion about how Misevich's daily activities supported the ALJ's RFC determination. *See* SSR96-8p, 1996 WL 374184, at *7. This the ALJ did not do.

In sum, the court finds that Dr. Reiter's 2008 opinion, without more detail, is simply inconclusive as to whether Misevich could sit continuously for one hour. Accordingly, neither Misevich's treating physician nor the state-agency physician advised the ALJ that Misevich had the ability to perform even the limited range of sedentary work that the ALJ prescribed. And the evidence to which the ALJ recited was similarly insufficient to support her RFC assessment. Add to that the ALJ's failure to provide the requisite narrative discussion as required by SSR 96-8p. The ALJ's opinion does not "enable [the court] to trace the path of [her] reasoning," and thus fails to provide a "logical bridge" between the evidence and the RFC conclusion. *See Scott*, 647 F.3d at 740 (finding no logical bridge where ALJ did not "explain how she reached her conclusions about Scott's physical abilities"); *Terry v. Astrue*, 580 F.3d 471, 476-77 (7th Cir. 2009) (remanding where ALJ's RFC determination was not supported by substantial evidence). A remand for further consideration is therefore required. *See Scott*, 647 F.3d at 740-41; *Terry*, 580 F.3d at 476-77.

28

**D.     Credibility**

Misevich next claims that the ALJ failed to properly analyze his credibility as required by SSR 96-7p.  (R. 25, Pl.'s Mem. at 15-20.)  First, he argues that the ALJ erred by using the boilerplate language regarding credibility repeatedly criticized by the Seventh Circuit and improperly assessed the credibility of his testimony after she developed the RFC finding. (Id. at 15-16.)  Second, Misevich contends that the ALJ did not specifically explain why she found Misevich's testimony regarding his pain and the side effects of the medications he took to alleviate his pain not credible.  (Id. at 17-20.)  The Commissioner counters that the ALJ's use of the credibility language was not improper because she adequately explained why she found Misevich's allegations regarding his pain not credible.  (R. 27, Def.'s Mem. at 9-14.) The Commissioner further contends that the ALJ properly considered the objective medical evidence, Misevich's allegations of disabling back pain and limitations, his treatment history, his medications and their side effects, and his daily activities in assessing Misevich's credibility and reasonably determined he was not as functionally impaired as alleged.  (Id.)

This court finds that the ALJ failed to properly assess the credibility of Misevich's hearing testimony.  An ALJ's credibility determination is "entitled to special deference because the ALJ is in a better position than the reviewing court to observe a witness." *Briscoe*, 425 F.3d at 354.  But where the credibility determination is based on objective rather than subjective considerations, an ALJ is in no better position to review those factors, and the reviewing court has greater freedom to review the ALJ's finding. *See Craft*, 539 F.3d at 678.  Because an ALJ's credibility finding is afforded "considerable deference,"

*Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), this court may "overturn a credibility determination only if it is patently wrong," *Craft*, 539 F.3d at 678, or if the ALJ fails to "justif[y] her conclusions with reasons that are supported by the record," *Richards v. Astrue*, 370 Fed. Appx. 727, 731 (7th Cir. 2010).

SSR 96-7p sets forth a two-step process for evaluating symptoms, such as pain. 1996 WL 374186, at *2. First, the ALJ must consider whether there is "an underlying medically determinable physical or mental impairment" that could "reasonably be expected to produce the individual's pain or other symptoms." *Id.* Second, if there is such an underlying physical or mental impairment, the ALJ "must evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* If a claimant's "statements about the intensity, persistence, or functional limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.* To build the required logical bridge for a credibility determination, SSR 96-7p requires that the ALJ consider not only the objective medical evidence, but also the claimant's daily activity, the duration, frequency, and intensity of pain, any precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. *Id.* at *3; *accord Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (per curiam). Moreover, the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to

30

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2; *see also Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

Here, the ALJ did not build the required logical bridge between the evidence and her determination of Misevich's credibility.  To start, the ALJ began her assessment of Misevich's credibility by stating that while "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (A.R. 18.)  The Seventh Circuit has consistently criticized this language as "even worse" than "meaningless boilerplate," because it "gets things backwards": "[d]oubts about credibility [are] critical to [the] assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility."  *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012); *see also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing.").  Although the ALJ's inclusion of such language does not warrant automatic remand, *see Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008), remand is appropriate here for the ALJ's credibility determination also fails to build the required logical bridge.

Aside from the unhelpful boilerplate, the ALJ rested her credibility determination on two other grounds.  The first: "[w]hile the medical evidence discloses the existence of back

pain such that the claimant has undergone surgical procedures, the longitudinal record does not disclose the persistence of overwhelming pain and other symptoms." (A.R. 18.) The second: "while the claimant might have some side effects because of his medication usage, the medical reports do not reveal that he has significant side effects. His medication usage is closely monitored, and if he were to experience significant side effects, his treating doctors would alter or change his prescribed medications." (Id. at 19.)

While recounting Misevich's medical history from 2002 through 2009, the ALJ acknowledged Misevich's numerous trips to various emergency departments of several hospitals which documented reports of back pain and limited range of motion in his back, and at times, an antalgic gait, but found significant that these visits demonstrated normal neurological examinations, normal reflexes and sensory and motor strength, and normal range of motion in his upper and lower extremity joints. (Id. at 18-19.) Misevich acknowledges this evidence, but argues that it does not necessarily undermine his allegations of disabling pain. (R. 31, Pl.'s Reply at 7.) He points to the ALJ's failure to mention the effect of his spinal stenosis on her credibility determination, as an error because it is a condition which causes pain. (R. 25, Pl.'s Mem. at 18; R. 31, Pl.'s Reply at 7.) Moreover, the ALJ, Misevich argues, was required to not only consider the objective medical evidence, but also "'the individual's statements about symptoms . . . in reaching a conclusion about the credibility of the individual's statements'[.]" (R. 25, Pl.'s Mem. at 17 (quoting SSR 96-7p).)

There are several problems with the ALJ's discussion of the objective medical evidence. First, the ALJ did not acknowledge Misevich's spinal stenosis or explain how that

32

condition factored into her determination that Misevich's allegations of pain were not credible. (A.R. 17-20). Although an ALJ need not mention every piece of evidence in her opinion so long as she builds a logical bridge from the evidence to her conclusion, an ALJ may not "cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Second, the ALJ appears to have found that Misevich's complaints of pain exceeded the medical record without justifying her conclusion with specific reasons. An ALJ cannot discredit a claimant's testimony about his pain and limitations "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citations omitted). In other words, an ALJ is not permitted to "disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (citation omitted).

Contained in the record is documentation describing several examinations where Misevich demonstrated a number of normal functions. Also within the record, however, is ample evidence of Misevich attempting to seek medical treatment for his back pain, including two back surgeries (A.R. 331-33, 899-901), the use of numerous pain medications to alleviate pain (id. at 40, 720, 759), and numerous MRIs, CT scans, and bone density scans designed to diagnose the source of his pain (*see, e.g.*, id. at 401-04, 413, 421, 435, 589-91, 601, 731-32, 733-34, 735-36, 743, 750, 766, 806-08, 809-10, 828-29. 830-32). Such persistent attempts to obtain relief of pain "may be a strong indication that the symptoms are a source

of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." SSR 96-7p, 1996 WL 374186, at *7.

But other than a recitation of the objective medical evidence tending to support her credibility determination, the ALJ's opinion contains insufficient analysis required of the other mandated SSR 96-7p factors. *See Villano*, 556 F.3d at 562. For example, the ALJ failed to adequately explain why she found Misevich's testimony regarding the limitations of his pain medications not credible. Misevich testified that to alleviate his continuous back pain, he took a variety of pain medications—Vicodin, Norco, Oxycodone, and morphine sulfate, extended release—that left him unable to function and made him feel like a zombie (A.R. 40), a side effect he reported to Dr. Reiter (id. at 796). According to Misevich, the Demerol he currently takes—which provides relief for about four hours and alleviates the pain about 70 percent—leaves him "very fatigued," "very drowsy," and "worn out." (Id. at 40-42, 57.) But despite the pain medication, Misevich testified that he continues to suffer from constant pain every day. (Id. at 40.). He stated that lying flat is the only position that provides him any relief, and that because of the pain, he can only walk one-half block and sit for seven to 11 minutes before having to stand. (Id. at 41-42, 46.)

The ALJ noted the limitations Misevich described due to his pain and the side effects of the pain medications (id. at 17-19), but she failed to explain why she found these allegations not fully credible. Although Misevich testified that the Demerol alleviated his pain, that admitted improvement does not necessarily equate with the ability to work on a full-time basis, particularly where Misevich testified that Demerol left him very fatigued.

34

*See e.g., Scott*, 647 F.3d at 739 ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."). The ALJ failed to analyze why she found the described limitations not fully credible, or to explain how they squared with her conclusion that Misevich could function while taking them to a point of being able to perform full-time work. Such an omission was reversible error. In reaching this conclusion, the court rejects the Commissioner's assertion that the ALJ could reasonably conclude Misevich's claims of pain were not credible because Dr. Reiter's contemporaneous treatment notes do not reflect any complaints of side effects from the medication. (R. 27, Def.'s Mem. at 12.) A claimant's failure to identify side effects does not necessarily undermine credibility. *See Terry*, 580 F.3d at 477.

An additional flaw in the ALJ's analysis was that the ALJ impermissibly "played doctor" and reached her own independent medical conclusion when she determined that Misevich's treating physicians would have altered or changed his prescribed pain medications if he were experiencing significant side effects. (A.R. 19.) *See Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (citing cases); *see also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong."). Dr. Reiter never gave any reason why Misevich's pain medications were not changed. The inference that Misevich was not prescribed different pain medications because he was not experiencing significant problems appears to be the ALJ's own inference with no substantial basis in the record. *See Myles v. Asrue*, 582 F.3d 672, 677-78 (7th Cir. 2009) (finding ALJ's inference that insulin was not prescribed because

35

claimant was not experiencing significant problems impermissible).  Accordingly, the ALJ failed to build a logical bridge between the evidence and her medical conclusion.

The Commissioner defends the ALJ's decision by arguing that the ALJ properly considered Misevich's daily activities and adequately explained how those daily activities are inconsistent with the ability to perform a reduced range of sedentary work.  (R. 27, Def.'s Mem. at 13.)  But as discussed above, while the ALJ obtained a description of Misevich's daily activities at the hearing, she never discussed why she found those activities inconsistent with his allegations of disabling pain and limitations.  Nor did she adequately explain how Misevich's daily activities demonstrated an ability to perform even a limited range of sedentary work.  *See e.g., Zurawski*, 245 F.3d at 887 ("The ALJ should have explained the 'inconsistencies' between [the claimant's] activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence.").  Such an inadequacy in the ALJ's opinion constitutes reversible error.

36

## Conclusion

For the foregoing reasons, Misevich's motion for summary judgment is granted insofar as it requests a remand.

**ENTER:**


Young B. Kim
United States Magistrate Judge